**FOR PUBLICATION**
UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X

In Re:                                                    Chapter 11

REVEL AC, INC., *et al.*                                  Case No. 14-22654 (MBK)

       Debtors.[1]

--------------------------------------------------------X

IDEA Boardwalk, LLC,

       Plaintiff

v.                                                        Adv. Pro. No. 14-01756 (MBK)

Polo North Country Club, Inc.,

       Defendant.

--------------------------------------------------------X

**APPEARANCES:**

Stuart J. Moskovitz, Esq.
Law Offices of Stuart J. Moskovitz, Esq.
819 Highway 33
Freehold, NJ 07728
*Attorney for Polo North Country Club, Inc.*

Jeffrey Cooper, Esq.
Barry Roy, Esq.
Rabinowitz, Lubetkin & Tully, L.L.C.
293 Eisenhower Parkway, Suite 100
Livingston, NJ 07039
*Attorneys for IDEA Boardwalk, LLC*

**MICHAEL B. KAPLAN, U.S.B.J.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856). For convenience, the Court refers to these entities collectively as the "Debtors" or "Revel".

## MEMORANDUM DECISION

### I.    Introduction

Before the Court is the summary judgment motion ("Motion") of Plaintiff,  IDEA Boardwalk, LLC ("Plaintiff" or "IDEA") which seeks judgment as to Counts I, II, VI and VIII of its First Amended Adversary Complaint ("Complaint") against Polo North Country Club, Inc. ("Polo North").[2] With regard to Counts I, II and VI of the Complaint, there is no dispute that this Court previously resolved the issues addressed in these Counts by this Court's June 30, 2015 Order Granting in Part Cross-Motion of IDEA Boardwalk, LLC Seeking Clarification of Rights Pursuant to 11 U.S.C.§ 365(h) and Granting in Part Preliminary Injunction ("Injunction Order"), together with the factual findings and legal conclusions set forth on the record and in the Court's Memorandum Decision, dated June 24, 2016 ("Decision").[3] *See* Docket Nos. 29 and 36, respectively.

At the heart of the remaining dispute is Count VIII, under which IDEA seeks declaratory relief as to its rights and obligations under § 365(h) regarding its commercial lease, previously rejected by the Debtors. While this Court has determined that IDEA, having elected to remain in possession of its leasehold, maintains certain statutory rights notwithstanding the sale of the Debtors' assets under §§ 363(b) and (f),[4] the parties advocate dramatically different positions with regard to their respective rights and responsibilities going forward under the rejected lease. Of paramount import to the parties, is a determination as to whether IDEA is entitled to a credit

---

[2] As noted by the Court at oral argument, Counts IV, V and VII of the Complaint are moot as being predicated upon the Debtors anticipated cure of defaults under the Lease, which cure efforts did not take place.  As such, the Court dismisses these counts as moot, *sua sponte*. Count III of the Complaint seeks the imposition of temporary restraints which was resolved as part of the prior Injunction Order and Decision. Accordingly, the Court treats Count III in the same fashion as Counts I, II and VI.

[3] *See In re Revel AC, Inc.*, 532 B.R. 216 (Bankr. D.N.J. 2015).

[4] The Court acknowledges that its prior Decision and Injunction Order may be subject to appeal by Polo North.

against the rent it owes on account of the "Recoupment Amount"[5], provided under the lease as a mechanism for IDEA to recapture all or a portion of its Capital Contribution. While this Court has admonished the parties repeatedly that it does not intend to serve as an unending private landlord-tenant court, it is incumbent upon this Court, and well within its jurisdiction as discussed below, to articulate the parameters of the landlord-tenant relationship resulting from the rejection of the lease and IDEA's election to remain in possession. Doing so will not only aid the parties in resolving pending disputes, but likely also assist and hopefully benefit courts which may be called upon to address future disagreements between the parties.

## II.    <u>Undisputed Facts and Procedural History</u>

### A.    **The Lease Agreement**

In April of 2012, the Revel opened a forty-seven-story resort-casino ("Casino") in Atlantic City, New Jersey.  As part of its plan for the Casino, Revel entered into a lease with IDEA dated May 12, 2012 ("Lease") to operate two upscale night clubs and a beach club ("Venues"). The Lease is for a ten-year term, with a fifteen-year option to extend the term. IDEA agreed to pay the Debtors at least $16 million as its share of the tenant fit-out in order to facilitate the budgeted $80 million in construction costs for the Venues. This outlay of capital was in addition to monthly rental payments due under the Lease.  The monthly rental obligation is bottomed on a calculation which takes into account Distributable Cash Flow for the Venues, multiplied against the Landlord's Percentage Share, resulting in a Percentage Rent amount. Under Section C.1(d) of the Lease, the Landlord's Percentage Share may vary, depending upon IDEA's actual Capital Contribution:

---

[5] In using certain capitalized terms, the Court employs such terms as used and defined under the subject lease, a copy of which is attached as Exhibit "A" to the Michael Barry Certification, filed in support of IDEA's Motion.

"Landlord's Percentage Share" shall mean sixty percent (60%), subject to any subsequent adjustment as provided in the last paragraph in Section M.(b), Section M.(d), Section 8.3(a) and Section 8.3(c).

Section M of the lease states as follows:

(1)     within two (2) business days following the Effective Date, Tenant shall contribute and pay to Landlord by wire transfer sixteen Million Dollars ($16,000,000);

(2)     within two (2) business days following the later to occur of (i) the date Tenant has received from Landlord (x) a temporary certificate of occupancy with respect to the Nightclub and (y) a certificate from a duly authorized officer of Landlord, in substantially the form attached as Exhibit "O," certifying that the representations and warranties made by Landlord in this Lease are true and correct in all respects as of the date of the payment set forth in this clause (2), and (ii) the eighty eighth (88th) day following the Effective Date (such later date being the "Second Installment Date"), Tenant shall contribute and pay to Landlord by wire transfer Eight Million Dollars ($8,000000); and

(3)     within (2) business days following the later to occur of (i) the date Tenant has received from Landlord a certificate from a duly authorized officer of Landlord, in substantially the form attached as Exhibit "O," certifying that the representations and warranties made by Landlord in this Lease are true and correct in all respects as of the date of the payment set forth in this clause (3) and (ii) the fifty eighth (58th) day following the Second Installment Date, Tenant shall contribute and pay to Landlord by wire transfer Eight Million One Hundred and Twenty Thousand Dollars ($8,120,000).

This section further provides that if Tenant fails to pay Landlord all or any portion of the amounts set forth in clauses (2) or (3) above, and Landlord funds all or a portion of either or both of such amounts:

Landlord's Percentage Share automatically shall be increased proportionally to an amount (expressed as a percentage) equal to (i) the amount Landlord so funds plus $48,180,000, divided by (ii) $80,300,000.

4

Significantly, § C(1)(a)(i)(1) of the Lease includes a mechanism under which IDEA may "recoup" its $16 million tenant fit-out costs within the first four years of operations:

> 1.    Notwithstanding the foregoing, with respect to any Venue:
>
> In the event that, in any Recoupment Measurement Period (defined below) for such Venue in which the applicable Gross Sales Threshold (defined below) has been met, (A) the Applicable TCC Amount (defined below) exceeds (B) an amount equal to 40% of the aggregate Distributable Cash Flow attributable to such Venue for such Recoupment Measurement Period, then Landlord shall pay to tenant, within thirty (30) days following the last day of such Recoupment Measurement Period, and amount (the "Recoupment Amount") equal to (x) the excess of the amount in clause (A) over the amount in clause (B) minus (y) the aggregate Recoupment Amounts previously paid to Tenant with respect to prior Recoupment Measurement Periods within the same Recoupment Year.

On June 19, 2014, after a failed sale effort and substantial cash flow concerns, the Revel filed its second voluntary Chapter 11 petition.[6] On August 11, 2014, Revel informed all tenants of its intention to close the Casino no later than September 10, 2014.  On August 28, 2014, Revel filed a motion to reject the Lease ("Rejection Motion"), *nunc pro tunc* to September 2, 2014, the date Revel in fact closed its doors. After the Casino closed and the Venues ceased operations, IDEA filed a Verified Complaint against Revel seeking injunctive relief to compel Revel to abide by the Lease.  On September 26, 2014, IDEA amended the Complaint seeking injunctive relief to protect its rights under the Lease, including the right to continued possession, utilities and necessary easements.  Revel filed a motion to dismiss the Complaint ("Motion to Dismiss") on October 13, 2014.

---

[6] Revel filed its first voluntary Chapter 11 petition on March 25, 2013, which case was closed on March 31, 2014. See Case No. 13-16253-GMB

### B.       Sale of Revel's Assets to Polo North

After Revel filed its Motion to Dismiss, Polo North and the Debtors executed an

Amended and Restated Asset Purchase Agreement ("APA") on March 20, 2015. The APA

specified that Polo North would purchase certain claims that the Debtors may have against

IDEA, and Polo North agreed to assume the Debtors' liability to IDEA for an administrative

claim in the amount of $133,872.31. On March 20, 2015, Debtors filed a motion to sell their

assets to Polo North ("Sale Motion") free and clear of liens, claims, encumbrances and interests,

including the Lease.[7] IDEA, together with other tenants, opposed the Sale Motion.  On April 6,

2015, this Court entered an Order granting the Sale Motion and approving the APA subject to

IDEA's rights under the Lease. Paragraph 18 of the Sale Order provides:

> Notwithstanding anything to the contrary in this Sale Order of the
> Agreement, the Sale of Assets to [Polo North] pursuant to this Sale
> Order shall not be free and clear of (i) any existing tenancies
> and/or possessory interests of the Amenity Tenants, ACR and
> IDEA, respectively, pending the Debtors' rejection pursuant to
> section 365 of the Bankruptcy Code of the agreements containing
> such tenancies and/or possessory interests (the "Possessory
> Agreements"), and (ii) any rights elected to be retained by each of
> the non-debtor counterparties to the Possessory Agreements
> pursuant to section 365(h) of the Bankruptcy Code after the
> Debtors' rejection of the respective Possessory Agreements (such
> tenancies, interests and rights referred to in (i) and (ii) collectively
> the "Possessory Interests").

The sale closed on April 7, 2015, subject to the Plaintiff's § 365(h) rights. In response to

the Rejection Motion, on April 13, 2015, Plaintiff filed a Cross-Motion for Clarification of

---

[7] This was not the first sale effort in the bankruptcy. As part of its first-day filings, Revel requested permission,
ultimately granted, to proceed to a quick auction of its assets. The request was for a sale "free and clear" of all liens
and interests (including leases). IDEA and other tenants objected, and after a lengthy marketing and negotiation
period Chief Judge Burns approved the sale, over the tenants' objections, at a hearing on January 5, 2015. The
District Court denied IDEA's emergency request for a stay of the sale; however, the Third Circuit entertained
IDEA's appeal from the District Court and entered an order staying that portion of the Sale Order that authorized
Revel to sell the Casino free and clear of IDEA's lease. Thereafter, continued negotiations ensued, leading to the
referenced Sale Motion.

§ 365(h) Rights (the "IDEA Cross-Motion"). On April 20, 2015, Chief Judge Burns entered an

Order Granting the Rejection Motion *nunc pro tunc* to the closing date, September 2, 2014.[8]

Thereafter, on May 1, 2015, IDEA filed its Notice of Election Pursuant to 11 U.S.C. § 365(h) as

formal notice of its election to retain its rights under the Lease "that are appurtenant to the real

property," including, but not limited to, its rights "such as those relating to the amount and

timing of payment of rent and other amounts payable by the lessee and any right to use,

possession, quiet enjoyment, subletting, assignment, or hypothecation" and utility and other

easements. See Main Case Docket No. 1664.  On June 22, 2015, the Court entered an Order

Granting Revel's Motion to Substitute Defendant and to Amend Caption, replacing Revel with

Polo North as the Defendant in this matter.

In connection with the IDEA Cross-Motion[9], this Court granted IDEA's request for a

preliminary injunction, enjoining Polo North from interfering with IDEA's ability to avail itself

of the rights under the Lease and appurtenant to the real property. With respect to Count VIII of

the Complaint, requesting a declaratory judgment as to the parties' rights and corresponding

obligations going forward pursuant to § 365(h), the Court's Decision states:

> As a consequence of the sale, Polo North has stepped into the
> shoes of the Debtors, and thus, Polo North is now treated as the
> landlord, with both the benefits and burdens of §365(h)… Under
> §365(h), the Tenants are entitled to remain in possession for the
> balance of the terms set forth in the Agreements, and any renewal
> or extension period.   §365(h)(1)(A)(ii).   During their time in
> possession, the Tenants retain the right to use and quiet enjoyment

---

[8] Upon Chief Judge Burn's retirement, the within proceeding was transferred to the undersigned on May 8, 2015.

[9] In this motion, IDEA was joined by other tenant groups: LDV Tenants and Amenity Tenant (collectively, "Tenants"). The Amenity Tenants consist of Exhale Enterprises XXI, Inc., GRGAC1, LLC, GRGAC2, LLC, GRGAC3, LLC, Mussel Bar AC, LLC, PM Atlantic City, LLC, RJ Atlantic City, LLC and The Marshall Retail Group, LLC.  The LDV Tenants consist of American Cut AC Marc Forgione, LLC, Azure AC Allegretti, LLC, and Lugo AC, LLC. The group of entities that now constitute the LDV Tenants were originally part of the Amenity Tenants, but later obtained separate counsel and designated as the LDV Tenants.

of the premises, as well as such rights appurtenant to the real property.  Appurtenant rights include such privileges which are incident and necessarily connected to the real estate.  Furthermore, the tenants may offset (against rent) any damages caused, after rejection, by the Debtors' nonperformance. §365(h)(1)(B). Inasmuch as the Tenants have elected to remain in possession, their rights to damages as a result of rejection (which was granted *nunc pro tunc* to the Shutdown Date) is limited to setoff against future rents.  After rejection, the landlord is no longer obligated to continue to perform under the lease, other than to provide the tenant with possession of the premises, and the rights appurtenant thereto.

Consistent with the Court's ruling, on June 30, 2015, the Court entered an Order Granting in Part Cross-Motion of IDEA, Seeking Clarification of Rights Pursuant to 11 U.S.C. § 365(h) and Granting in Part Preliminary Injunction.  In pertinent part, the Injunction Order stated:

3.  As the holder of true leases, the Tenants are entitled to their respective possessory right under 11 U.S.C. §365(h), including "rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any rights of use, possession, quiet enjoyment, subletting, assignment, or hypothecation," as well as such rights appurtenant to the real property, for the balance of the terms set forth in the Agreements and any renewal or extension period, notwithstanding a sale of the Debtors' assets pursuant to 11 U.S.C. §363

4. The request of IDEA for a preliminary injunction made in Count I of the Complaint is, in part, granted.

5. Polo North Shall be preliminarily enjoined from interfering with IDEA's ability to avail itself of the rights under its lease of nonresidential real property and appurtenant to the real property, including the right to quiet enjoyment, and to use for the purpose of which it was leased.

On August 28, 2015, Polo North filed an answer to the Complaint denying the allegations and asserting counter-claims against IDEA, to which IDEA subsequently filed an answer denying same. After several unsuccessful mediation efforts, IDEA filed the within Motion seeking summary judgment on the remaining counts referenced above. The matter came on for

oral argument on September 23, 2016, at which time the Court placed on record a preliminary

ruling, subject to the filing of this opinion and order.

## III.   Jurisdiction

Jurisdiction over this action is found under 28 U.S.C. §§ 1334(a) and 157(a), as well as

the Standing Order of the United States District Court dated July 10, 1984, as amended October

17, 2013, referring all bankruptcy cases to the bankruptcy court.   This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O), and "arises under"

title 11.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   As outlined by

the Third Circuit, bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases

"under" title 11; (2) proceedings "arising under" title 11; (3)   proceedings "arising in" a case

under title 11;  and  (4) proceedings  "related to" a case under title 11. *In re Combustion Eng'g,*

*Inc.*, 391 F.3d 190, 225 (3d Cir.2005).   As explained in *In re Bell*, 476 B.R. 168, 175 (Bankr.

E.D.Pa. 2012), "arising under" jurisdiction includes any proceeding which invokes a substantive

right under the Bankruptcy Code. A proceeding that "arises under" title 11 is also described as

one that "involve[s] a cause of action created or determined by a provision of title 11." *In re*

*Ciena Capital LLC*, 2009 WL 2905759, at *5. The current action is one which involves the

substantive rights granted by § 365(h), and thus qualifies as a matter "arising under" title 11.

Again, as noted previously in the Court's Decision, to the extent statutory jurisdiction

remains at issue, the Court also possesses ancillary jurisdiction to hear this dispute. Bankruptcy

courts, as courts of limited jurisdiction, may exercise subject matter jurisdiction on two grounds:

statutory jurisdiction under 28 U.S.C. § 1334 and ancillary (sometimes called inherent)

jurisdiction. *See In re Fibermark, Inc.*, 369  B.R.  761, 764  (Bankr. D.  Vt.  2007);  *In   re*

*Chateaugay    Corp.,*    201    B.R.    48, 62   (Bankr.S.D.N.Y.1996*), aff'd*   213    B.R.   633

(S.D.N.Y.1997). The United States Supreme Court has held that federal courts may assert ancillary jurisdiction for two separate, though sometimes related purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380–81 (1994) (citations omitted). Here, the Court is asserting ancillary jurisdiction to enforce the Sale Order, which expressly reserves this Court's jurisdiction over matters arising out of or related to the sale of the Debtors' assets. Pertinently, the Sale Order provides:

> **This Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or related to this Sale Order**, the [Asset Purchase] Agreement or any related agreements, **including, without limitation: (i) any actual or alleged breach or violation of this Sale Order**, the [Asset Purchase] Agreement or any related agreements; (ii) the enforcement of any relief granted in this Sale Order; or (iii) as otherwise set forth in the [Asset Purchase] Agreement.

*See* Sale Order, Docket. No. 1550, ¶ 37 (emphasis added). Accordingly, issues as to the remaining relative rights of the parties under § 365, and their respective abilities to act on such rights, fall well within the parameters of the Sale Order, and this Court maintains jurisdiction over this action.

## IV.   Discussion

### A.   Rights of the Parties Under the Lease

The parties do not dispute that, on March 20, 2015, the Debtors filed a motion to sell their assets to Polo North, free and clear of liens, claims, encumbrances and interests, including the Lease. IDEA opposed the Sale Motion and, on April 6, 2015, the Court entered an order

approving the sale, subject, however, to IDEA's leasehold and statutory rights under § 365(h), as

ultimately determined by the Court.

Section 365(h) provides:

>   (h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—

>   (i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

>   (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

>   (B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

Sections 363(b) and (f) of the Bankruptcy Code allow for the sale of a debtor's assets free

and clear of any interest in property. Here, the sale to Polo North was made expressly subject to

the statutory leasehold interests of IDEA. Previously, this Court ruled that the sale under § 363

did not trump the rights afforded IDEA under § 365(h). As a consequence of the sale, Polo North

has stepped into the shoes of the Debtors, and thus, Polo North is now treated as the landlord,

with both the benefits and burdens of § 365. Pursuant to § 365(h), IDEA is entitled to remain in possession for the balance of the terms set forth in the Lease, and any renewal or extension period. § 365(h)(1)(A)(ii).  During its time in possession, IDEA retains certain rights, such as those relating to the amount and timing of payment of rent, as well as the right to use and quiet enjoyment of the premises, along with such rights appurtenant to the real property (appurtenant rights include such privileges which are incident and necessarily connected to the real estate). Furthermore, IDEA may offset against the rent reserved under the Lease (against future rent) any damages caused, after rejection, by the nonperformance of the Lease obligations. § 365(h)(1)(B).

Inasmuch as IDEA has elected to remain in possession, its rights are limited to recovery of post-rejection damages by means of set-off against future rents. As a consequence of the Lease rejection, Polo North is no longer obligated to continue performance under the Lease, other than to provide IDEA with possession of the premises, and the rights appurtenant thereto. *See In re Flagstaff Realty Associates*, 60 F.3d 1031, 1034 (3d Cir. 1995) ("The primary function of rejection is to 'allow a debtor-lessor to escape the burden of providing continuing services to a tenant' [and] rejection 'relieves the estate from covenants requiring future performance, such as the provision of utilities, repairs, maintenance and janitorial services by the debtor'") (citations omitted).

Unfortunately, the broad language employed in § 365(h) relative to the retention of "rights under the lease" and the tenant's obligation to pay the "rent reserved under the lease" offers little guidance as to the parameters of the leasehold relationship going forward. For instance, notwithstanding the rejection of the Lease, are the restrictions as to IDEA's use of the premises found under Article 5 of the Lease still applicable? The same inquiry arises with regard

12

to IDEA's (1) maintenance and repair obligations under Article 9, (2) indemnification

obligations under Article 10, and (3) insurance obligations under Article 11.[10]  Likewise, as

noted previously, after rejection, Polo North is no longer obligated to continue performance

under the Lease, other than to provide the tenant with possession of the premises, and the rights

appurtenant thereto. Do the restrictions placed upon Polo North with regard to leasing space for

the operation of a competitive Nightclub Venue, found in Section 5.8, remain in effect? [11] Most

significantly to the parties, does § 365(h) address whether the obligation to provide for

recoupment of IDEA's capital contributions remain operative, or has the obligation been

discharged under the Debtors' confirmed plan?  Did Polo North acquire the Casino free and clear

of this obligation under the Sale Order?  In Count VIII of the Amended Complaint, IDEA seeks a

declaration by this Court as to relative rights and obligations under the rejected Lease and both

Polo North and IDEA have sought a resolution of these issues from the Court as part of the

pending adversary proceeding.

   The Court's analysis begins with the concept of "rejection" under the Bankruptcy Code.

It is beyond cavil that rejection differs from termination and does not alter the substantive rights

of the parties to the lease. *In re Chestnut Ridge Plaza Associates, L.P.,* 156 B.R. 477, 483

(Bankr.W.D.Pa.1993).   Rejection of a contract is a debtor's determination not to perform its

obligations under the contract.   *In re Hawker Beechcraft, Inc.,* 486 B.R. 264, 277 (Bankr.

S.D.N.Y. 2013) ("rejection signifies that the debtor will breach the contract and not perform").

As such, rejection equates to a breach of the contract, not a termination. 11 U.S.C. § 365(g); *see*

---

[10] The Court recites these examples for illustrative purposes only, and does not suggest that this is an exhaustive list of tenant obligations under the Lease.

[11] The parties have neither briefed nor addressed the application of § 365(h)(1)(C) relative to shopping center leases and the landlord's continuing obligations under a rejected lease with respect to radius, location, use, exclusivity, or tenant mix or balance. The Court need not resolve this issue for purposes of this ruling.

*also In re Overseas Shipholding,* 2015 WL 3475727, at *2-3 (Bankr. D. Del. June 1, 2015) (rejection of a lease is a breach, not a termination). "It is well-settled that the rejection of a lease pursuant to § 365 results in a prepetition breach; it does not constitute a termination of the lease." *In re DBSI, Inc.,* 409 B.R. 720, 731 (Bankr.D.Del.2009) (*citing In re Austin Dev. Co.,* 19 F.3d 1077, 1082–83 (5th Cir.1994)); *See generally* 4 Collier on Bankruptcy § 365.10 [1], at 365–77 (Alan N. Resnick & Henry J. Sommer eds., 16th rev. ed. 2010). The primary function of rejection is to "allow[ ] a debtor-lessor to escape the burden of providing continuing services to a tenant." *In re Lee Road Partners,* 155 B.R. 55, 60 (Bankr.E.D.N.Y.1993) (citing cases), *aff'd,* 69 B.R. 507 (E.D.N.Y.1994). Rejection affects the lessor's duties to the tenant. *See In re Stable Mews Associates, Inc.,* 41 B.R. 594, 597 (Bankr.S.D.N.Y.1984) (rejection "reliev[es] the estate from covenants requiring future performance, such as the provision of utilities, repairs, maintenance and janitorial services by the debtor").

IDEA advances the argument that the Debtor (and now Polo North, through acquisition of the Debtors' rights and interests), having rejected the Lease, relinquished its entitlement to enforce IDEA's agreements and covenants. This contention finds no support in the law. As the Third Circuit observed in *In re Flagstaff Realty Associates*, *supra*, "[t]he *Chestnut Ridge* court emphasized that [t]he obligations under the lease and rights associated with the tenant's leasehold interest do not just vanish because a debtor has rejected the lease. The leasehold interest remains intact and the lease remains operative between the parties. [citations omitted]" *Flagstaff*, 60 F.3d at 1034 (3d Cir. 1995).  Thus, the impact of the Debtors' rejection of the Lease, and IDEA's election to remain in possession is clear: by electing to remain in possession and assert its rights under § 365(h), IDEA, in effect, waives the Debtors' breach of the Lease and opts instead to continue its relationship under the existing terms and conditions. IDEA exercised its right not to

14

terminate the Lease, to which it was entitled under § 365(h)(1)(A)(i), and instead opted to continue its relationship with Polo North. IDEA is required to operate its Venues, in compliance with its responsibilities under the Lease, as long as there are no legal or physical impediments to doing so. There is, however, one important qualification: § 365(h) provides an overlay with regard to the parties' respective leasehold rights. Specifically, while IDEA remains constrained to adhere to all of its covenants and agreements under the Lease, § 365(h)(1)(B) allows IDEA to offset against future rent any damages caused, after rejection, by the Debtors' nonperformance of the Lease terms.

The parameters of Polo North's lease obligations, post-rejection, have slightly less clarity. There is no question that the Debtors' rejection of the Lease, subsequent to closing on the sale to Polo North, relieved Polo North of all performance duties except to allow for IDEA's continued possession (after IDEA's Notice of Election), together with IDEA's use and quiet enjoyment of the premises, along with such rights appurtenant to the real property. Polo North need not comply with the balance of the performance obligations under the Lease (*e.g.,* further build-outs, maintenance, janitorial services, repairs, security, utilities, etc.), unless the failure to perform interferes with IDEA's possession, use and quiet enjoyment of the facilities.

### B.        Recoupment of Tenant's Capital Contribution

IDEA submits that § 365(h)(1)(B) allows it to offset against future rent any damages caused, after rejection, by the nonperformance of the Lease terms, which should include the capital recoupment obligation. At a bare minimum, IDEA argues that the payment of the Recoupment Amount is an element of the "rent reserved" under the Lease which falls under the ambit of § 365 (h). In contrast, Polo North contends that it acquired the Casino under the Sale Order, free and clear of this claim. In addition, Polo North argues that the Debtors' rejection of

the Lease under § 365 eliminated this performance obligation, and that any claim IDEA may

have for repayment of its Capital Contribution was discharged under the Debtors' confirmed

plan. Lastly, Polo North suggests that it is simply inequitable for the Court to impose this

repayment obligation upon the buyer of assets. For the reasons which follow, this Court

disagrees with all of these contentions.

This Court has addressed already whether Polo North's acquisition of the Debtors'

interest in the Casino, free and clear of all claims, serves as a bar to IDEA's efforts to recoup its

capital investment for the fit-out, as provided under the Lease. In taking the affirmative position,

Polo North attempts to re-litigate the issues resolved in the Court's previous Decision and

Injunction Order. Simply put, this Court has ruled that §§ 363 (b) and (f) do not override the

protections and rights afforded tenants under § 365(h) and that Polo North acquired its interests

in the Casino subject to these rights. IDEA's § 365(h) rights were neither impacted by the sale

nor discharged under the Debtors' confirmed plan. The issue then is limited to whether the

capital recoupment right falls within the scope of § 365(h) rights.

The Third Circuit Court of Appeals in *In re Flagstaff Realty Assocs.,* 60 F.3d 1031 (3rd

Cir.1995), addressed a similar situation. In *Flagstaff*, the debtor, a commercial landlord, prior to

filing for bankruptcy defaulted on its responsibility to make necessary repairs. The tenant, a

grocery store, unhappy with the situation, notified the landlord that if the necessary repairs were

not made, it would perform the repairs at its expense, and exercise its contractual right under its

lease to offset against the rent.  The lease expressly allowed the tenant to recoup repair costs

from the rent and, significantly, did not have any provision that expressly prohibited recoupment

against the rent. The tenant subsequently made the repairs and, thereafter, the landlord filed for

Chapter 11 protection before the tenant could receive credit against rental payments. Shortly

after filing, the landlord moved to reject the lease and listed the tenant's claim for the costs of

making the improvements as an unsecured claim. The tenant, like IDEA, exercised its right to

remain in possession of its leasehold under § 365(h) and filed an adversary proceeding for a

declaration of the rights of the parties with respect to the rental payments and repair issue. The

tenant sought to reduce the rent going forward as part of its obligation to pay the "rent reserved"

in the lease, as required under § 365(h)(1)(B).  The bankruptcy court granted the landlord's

motion to reject and denied tenant's application to offset its repairs pursuant to the recoupment

doctrine or, in the alternative, to § 365(h). The tenant appealed and the District Court affirmed

the Bankruptcy Court. The tenant appealed to the Third Circuit.

The Third Circuit addressed whether the monies expended by the tenant before

bankruptcy could be recaptured or otherwise credited against rental payments due thereafter,

where the landlord had rejected the lease. The Third Circuit concluded that the tenant could

offset the obligation and reversed. As part of its ruling, the Third Circuit determined that the

provision of the lease providing for a reduction of rent in exchange for capital improvements was

part of the rent calculation. Specifically, the Third Circuit stated as follows:

> In essence, the parties agreed that if tenant advanced certain costs
> which were the obligation of landlord, the rent would be reduced
> accordingly. The reduced rent is the 'rent reserved,' and it is that rent
> which the tenant is required to pay. . . . Thus, although the rejection of
> the lease by the debtor-landlord relieves it of prospective obligations to
> perform under the lease, it does not relieve it of its obligations to
> accept the agreed upon reduced rent provided for under the terms of
> the lease.

*Flagstaff*, 60F.3d at 1034.

Unfortunately, unlike the straightforward language employed in the lease under review in

*Flagstaff*, the sixty-seven page Lease agreement is a bloated morass of cross-referenced terms

and definitions which serves to confuse rather than inform the reader, and impedes the Court's

17

analysis.  As to IDEA's rent obligation and its entitlement to recapture its Capital Contribution,

the Lease provides, in relevant part[12]:

> C.      Rent.
>
> I. Rental Obligations; Percentage Rent; Recoupment Amount.
>
> (a)      Tenant, in accordance with this Section C and Section 2.1 of the Lease, shall pay to Landlord, as percentage rent hereunder, and as part of the consideration of the aforesaid demise, for each Lease Year (as defined in Section C.l.(d)) ("Percentage Rent"), which Percentage Rent shall be payable monthly as set forth in Section C.1.(c) below.
>
> (i) For  each  Lease Month  (as defined in Section 1.3) commencing after the applicable Commencement Date for any Venue, Percentage Rent shall be an amount equal to the product of Distributable Cash Flow[1] for such Venue during the applicable Lease Month multiplied by Landlord's Percentage Share (defined in Section C.l(d)(iii).

Article 2 of the Lease further provides, in relevant part, as follows:

> SECTION 2.1 Percentage Rent
>
> (a) The Percentage Rent shall be payable without prior demand and without any setoff or deduction whatsoever, at the times set forth hereinafter at the place then fixed for the payment of Rent. Subject to Section C.l(a)(i), Tenant shall pay Percentage Rent for each venue on a monthly basis during each Lease Year, beginning with the Lease Month commencing after the applicable Commencement Date, based upon Distributable Cash Flow reported with respect to such Lease Month as required under this Article 2.

With regard to IDEA's obligation to provide the Debtors with the information necessary

to confirm the amount of Percentage Rent and Recoupment Amount due and owing to the

respective parties, Section 2.3 of the Lease states as follows:

> (a) Not later than the thirtieth (30th) day after the end of each Lease Month commencing after the Center Bar

---

[12] The cited provisions of the Lease have been extracted from the copy of the Lease appended as Exhibit "A" to the Certification of Michael Barry submitted in support of Plaintiff's Summary Judgment Motion.

Commencement Date, Tenant shall submit to Landlord a reasonably itemized and accurate written statement (the "Monthly Operating Statement") signed by Tenant . . . reflecting the calculation of Net Operating Profit for each opened Venue in such Lease Month and certifying same to be true and correct in all material respects to the best of Tenant's knowledge.  The Monthly Operating Statement shall also include the calculation for arriving at Percentage Rent for Such Lease Month.

(b) Not later than sixty (60) calendar days after the end of each Lease Year during the Original Term, Tenant shall submit to Landlord a complete written statement of Gross Sales, Percentage Rent, Net Operating Profit, the Tenant Fees and Distributable Cash Flow for such Lease Year in such reasonable detail, as requested by the Landlord, accompanied by a statement signed and certified by Tenant . . ., stating that the calculation of Gross Sales, Percentage Rent, Net Operating Profit, Tenant Fees and Distributable Cash Flow are computed in material compliance with the definitions thereof in this Lease.

Nowhere in these provisions or elsewhere in the Lease can the Court glean the explicit right to offset future rent by any Recoupment Amounts due and owing IDEA.[13] Even the broad definition of "Additional Rent" found in Section 2.6 of the Lease fails to account for any credit for recoupment amounts due IDEA.[14] Rather, the payment of the Recoupment Amount represents an obligation, separate and apart from the "rent reserved" under the Lease. Yet, this does not end the Court's examination. Section 365(h)(1)(A)(ii) preserves all of IDEA's Lease rights which *relate "to the amount and timing of payment of rent and other amounts payable by the lessee"*. The language of the Lease and the conduct of the parties affirm that the

---

[13] At this juncture, the record remains unclear as to whether IDEA paid the initial $16 million capital contribution, or additional funds required under the Lease, which of course impacts the calculation of the Percentage Rent owing Polo North. For purposes of addressing the declaratory relief sought under Count VIII of the Amended Complaint, the Court need not make the factual findings necessary to fix the amounts due the parties.

[14] Section 2.6 states that "[A]ll sums of money or charges required to be paid by Tenant under this Lease, whether or not the same are designated 'Additional Rent', shall for all purposes hereunder be deemed and shall be paid by Tenant as Ren…"

Percentage Rent and recoupment payment obligations are very much related, and, in point of fact, expressly linked.

The Recoupment Amounts due for any Recoupment Period are calculated under a formula which takes into account the aggregate Distributable Cash Flow for each Venue (used to also calculate the Percentage Rent) and the Landlord's Percentage Share (based on the amount of the capital contribution actually made). More simply, IDEA's entitlement to recoup its capital investment arises only after certain thresholds in Percentage Rent have been reached. The direct relationship between the payment of Percentage Rent and the entitlement to recoup IDEA's investment is further evident in the fact that several millions of dollars of Percentage Rent payments, undeniably due Polo North, have been withheld pending resolution of the within dispute. In negotiating its obligations under the Lease, including the amount and timing of Percentage Rent, IDEA factored in its ability to recapture its capital investment. The language employed in Section C.1(a)(i)(3) clearly speaks to this:

> (3) Landlord acknowledges and agrees that this Section C.1(a)[which includes the mechanism for payment of the recoupment Amount], Section P and Section 5.8 are material inducements for Tenant to enter into this Lease and that Tenant would not have entered into this Lease but for Section C.1(a), Section P and Section 5.8

This Court finds that the right to recoup its Capital Contribution relates to amounts payable by IDEA, so as to fall within the ambit of rights preserved under § 365(h)(1)(A)(ii).

This Court chooses to follow the guidance of the Third Circuit in *Flagstaff*, *supra,* and looks also beyond the statute for resolution of the dispute. In *Flagstaff*, the creditor undertook the debtor's lease obligation to repair and maintain the premises in reliance on the lease terms that allowed the tenant to reduce its rent if the tenant cured the lessor's default on its obligations to maintain the premises. The Third Circuit held that to allow the debtor to receive rent without

compensating the creditor for undertaking the repairs would be inequitable, and thus employed

the doctrine of "equitable recoupment" to further support its decision. *Flagstaff,* 60 F.3d at

1036.   As in *Flagstaff,* even if statutory grounds are not available, the equitable doctrine of

recoupment provides relief for IDEA.

Recoupment is an equitable remedy which permits the offset of mutual debts when the

respective obligations are based on the same transaction or occurrence. This common law

doctrine is not codified in the Bankruptcy Code, but has been established through decisional law.

*See, e.g., Anes v. Dehart (In re Anes),* 195 F.3d 177, 182 (3d Cir.1999); *University Med. Ctr. v.*

*Sullivan (In re University Med. Ctr.),* 973 F.2d 1065, 1081 (3d Cir.1992).   The Third Circuit

defines the equitable doctrine of recoupment as follows: recoupment is the setting up of a

demand *arising from the same transaction* as the plaintiff's claim or cause of action, strictly for

the purpose of abatement or reduction of such claim. *University Medical Center,* 973 F.2d at

1079 (*quoting* 4 Collier on Bankruptcy § 553.03, at 553–15–17) (emphasis in original). As the

Third Circuit explained in *Lee v. Schweiker:*

> The justification for the recoupment doctrine is that where the
> creditor's claim against the debtor arises from the same transaction
> as the debtor's claim, it is essentially a defense to the debtor's claim
> against the creditor rather than a mutual obligation, and application
> of the limitations on setoff in bankruptcy would be inequitable.

739 F.2d 870, 875 (3d Cir.1984).

As further explained in *University Med. Ctr. v. Sullivan (In re University Med. Ctr.),* 973

F.2d 1065, 1081 (3d Cir.1992):

> In the bankruptcy context, recoupment has often been applied
> where the relevant claims arise out of a single contract "that
> provide[s] for advance payments based on estimates of what
> ultimately would be owed, subject to later correction." ... However,
> an express contractual right is not necessary to effect a
> recoupment.... Nor does the fact that a contract exists between the

21

> debtor and creditor automatically enable the creditor to effect a recoupment....
>
> For the purposes of recoupment, a mere logical relationship is not enough: the "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the 'same transaction.' " Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.

*University Medical Center,* 973 F.2d at 1080–81 (citations omitted). This case satisfies the "same transaction" test. Both the claim for the Recoupment Amounts and the Percentage Rent obligations arise from the Lease, and as explained above, the obligations are inextricably linked. It would be inequitable for Polo North to receive the Percentage Rent without compensating IDEA for the substantial fit-out cost.

Polo North posits that it purchased the assets free and clear of IDEA's capital recoupment claim and that any such claim was an obligation solely of the Debtors, and discharged under the confirmed Plan. Moreover, at oral argument, when presented with the assertion of equitable recoupment, counsel for Polo North queried and challenged the equities in mandating that a third party purchaser pay the Debtors' obligation. Courts addressing the issue previously have affirmed that recoupment obligations survive plan discharges. As noted, the Third Circuit Court in *In re Flagstaff* held that § 1141(c) is not a *per se* bar to post-confirmation recoupment. *Id.* at 1035 (*citing to In re Rooster, Inc.,* 127 B.R. 560 (Bankr.E.D.Pa.1991) (creditor permitted to recoup despite failure to appeal from the confirmation order nor seek a stay pending appeal); *In re Maine,* 32 B.R. 452, 453 (Bankr.W.D.N.Y.1983) (creditor permitted to recoup despite failure to object to confirmation of the plan nor appeal the confirmation order). *See also In re Black,* 280 B.R. 680, 684–85 (Bankr. N.D. Ala. 2001) (chapter 11 debtors' confirmed reorganization plan,

did not prevent vendor's probate estate from asserting, by way of recoupment to debtors' state

court claims for breach of warranty of title).

As to whether it is inequitable to place upon Polo North the burden of repayment of the

substantial sums expended for fit-out of the Venues, the Court does not share Polo North's

perspective. As did Revel, Polo North continues to receive the benefit of all the improvements

made upon its acquired real estate.[15] Indeed, Section 8.2 of the Lease provides that upon the

expiration of the Lease term or termination of the Lease, all of the components of the Premises

Fit-Out Work become Polo North's property. It would be a windfall for Polo North to benefit

from the fit-out of the Venues, free and clear of IDEA's recoupment rights under the Lease.

Moreover, it is somewhat disingenuous for Polo North to suggest that it is unfairly being

compelled to pay the Debtors' obligation. IDEA's entitlement to Recoupment Amounts arises

only after the Venues satisfy certain negotiated Gross Sale Thresholds; likewise, Polo North

must repay a portion of IDEA's Capital Contribution only after having received the Percentage

Rent satisfying these thresholds. In point of fact, the Lease provides that IDEA must refund any

received capital recoupment payments to the extent the Venues fail to meet certain annual Gross

Sale Thresholds. The Court presumes that the sophisticated parties, with counsel, who initially

negotiated the Lease terms ensured that Revel's interests (and now Polo North's) are protected

by the formulas crafted for fixing the level of Percentage Rent and Gross Sale Thresholds. The

Court finds that continuing the extant lease arrangement is not inequitable.

C.    **Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[15] The Court cannot ignore the obvious- Polo North acquired the Casino at a substantial discount from the $2.5 billion project cost.

Civ. P. 56(a). As the Supreme Court has indicated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 1). "In deciding a motion for summary judgment, the judge's function is to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 323). In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Disputed material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute is genuine when it is "triable," that is, when reasonable minds could disagree on the result. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations omitted). In the matter at bar, the material facts and record are not in dispute and the declaratory relief sought in Count VIII of the Complaint raise strictly a legal issue; to wit, the scope of the parties' rights under the Lease pursuant to § 365(h). Resolution of the within dispute by summary judgment is warranted.

**D.**       **Abstention from Further Issues Regarding the Lease**

Having set forth the parameters of the parties respective rights and obligations going forward under the Lease, the work of this Court is done. The Court recognizes that there are a plethora of factual issues which may need to be resolved, such as the extent of the Capital Contributions made by IDEA, the calculation of the Landlord Percentage Share and the fixing of outstanding Percentage Rent due Polo North after taking into account various offsets and additional charges. This Court questions, however, its jurisdiction to go beyond the declaratory relief relative to § 365(h) sought in Count VIII of the Complaint. Resolving the remaining factual issues in dispute does not involve either the enforcement or interpretation, of this Court's prior orders, or hold a sufficient nexus to the confirmed plan.[16] Resolution of open issues will not further the interests of creditors under the confirmed plan, nor impact the bankruptcy estate in any fashion. Simply stated, this remains now a dispute between non-debtor third parties, involving state law issues of contract enforcement.   Accordingly, the Court will *sua sponte* abstain from hearing further disputes relative to this Lease and relationship.

It is well-settled that a court may raise the issue of abstention *sua sponte*. *In re Strano*, 248 B.R. 493, 503 (Bankr.D.N.J.2000). The decision whether to abstain falls within sound discretion of the court. *In re Asousa P'ship*, 264 B.R. 376, 391 (Bankr.E.D.Pa.2001). Even where it has jurisdiction, a bankruptcy court is not compelled to hear a case; the court may, in its

---

[16] In *In re Resorts Int'l*, 372 F.3d 154, 168-69 (3d Cir. 2004) the Third Circuit developed a standard for determining the extent to which the bankruptcy court retains subject matter jurisdiction over related-to claims post confirmation:

> [T]he essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter. . . . Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.   Under those circumstances, bankruptcy court jurisdiction would not raise the specter of "unending jurisdiction" over continuing trusts [the example in issue].

*Resorts*, 372 F.3d at 166-67.

discretion, abstain from hearing the matter. *In re P & G Realty Corp.,* 157 B.R. 239, 242

(Bankr.W.D.Pa.1993).  Abstention in the bankruptcy court is governed by 28 U.S.C. § 1334(d)

and 11 U.S.C. § 305(a), which confer discretion upon bankruptcy courts to dismiss or suspend an

action should such decision better the interests of the parties. *In re A & D Care, Inc.*, 90 B.R.

138, 141 (Bankr.W.D.Pa.1988). To determine whether permissive abstention is appropriate,

courts apply a variety of factors, including the following:

> (1) the court's duty to decide what is before it; (2) the effect on the
> efficient administration of the estate if the court abstains; (3) the
> possibility of inconsistent results stemming from the abstention;
> (4) the waste of judicial resources; (5) the presence of difficult or
> unsettled areas of state law more properly addressed in a state
> forum; (6) considerations of comity; (7) prejudice to any non-
> debtor party from proceeding in federal court; (8) the extent to
> which state law issues predominate over bankruptcy issues; (9) the
> presence of a related proceeding commenced in state court; (10)
> jurisdictional basis other than 28 U.S.C. § 1334; (11) how related
> the case is to the main bankruptcy case; (12) the substance of a
> "core" proceeding; (13) the feasibility of severing state law claims
> from the bankruptcy case; (14) the burdens to the court's docket;
> (15) the existence of a right to a jury trial; and (16) the presence of
> non-debtor parties in the case.

*In re Strano*, 248 B.R. 493, 504 (Bankr.D.N.J.2000). After considering these factors—namely

the remoteness of the proceeding to the administration of the main bankruptcy case, the lack of a

close nexus to the confirmed plan, the substantive non-bankruptcy issues in dispute, the relative

ease in which the parties could address the issues in a non-judicial forum, the interests of judicial

economy, and the burden to the Court's docket—the Court will abstain from adjudicating the

remaining claims (including counterclaims), and concludes that abstention best serves the

interests of the parties and the Court.[17]

---

[17] Having abstained from all further issues relative to the Lease and disputes between the parties, the Court will not
exercise further jurisdiction over funds escrowed pursuant to prior Court Order, or payment of the withheld

## V.     <u>Conclusion</u>

Having elected to remain in possession, IDEA is required to comply with all terms and agreements set forth in the Lease, subject only to its offset rights under § 365(h).  Polo North is excused from its performance obligations, except to allow for IDEA's continued possession, together with IDEA's use and quiet enjoyment of the premises.   Additionally, Polo North remains obligated to comply with the recoupment of capital provisions under the Lease.  The Court abstains from hearing all other disputes relative to the Lease.  Plaintiff is directed to submit a Form of Judgment consistent with this opinion.

Dated: October 21, 2016

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

administrative claim of $133,872.31.  Absent further order of a court of competent jurisdiction, Polo North is directed to pay the administrative claim owing IDEA within fifteen (15) days of the entry of the final order herein.